# Goode v. Orozco

*Alexander J. Karam, Jr.*, for plaintiff.
*Nicholas Sabatine, III*, for defendant.

WILLIAMSON, *J.*, August 14, 2013—This matter comes before the court following a full evidentiary hearing on custody and a petition for contempt. John Goode, Jr. (father) and Juana Orozco (mother) are the parents of John Goode, III (age 6) and Juliana Goode (age 3). In addition to the hearing to determine custody, father also filed a petition for contempt of the existing custody order. We will dismiss father's petition for contempt. We are now prepared to enter an order concerning custody.

The most recent custody order entered in this matter was dated May 9, 2013 adopting the custody conciliator's recommendation of May 8, 2013, following a conciliation conference before the custody conciliator. That order awarded shared legal custody to mother and father, with father having physical custody subject to mother's periods of partial physical custody on the first, second and fourth weekends of every month and a shared holiday and summer vacation schedule.

Father is 56 years old and retired from the U.S. Postal Service. He has an adult daughter, age 37, and the two children subject to this custody matter. John III was born November 2, 2006 and Juliana was born February 12, 2010. Father lives in Smithfield Township, East Stroudsburg, Pennsylvania in a four (4) bedroom 2 1/2 bath ranch home that he owns. Father also maintains several rental units in the Newark, New Jersey area.

Mother is 46 years old. She works as a home health care worker in the Newark, New Jersey area. Mother's exact work schedule at this time is not clear. It appears she worked 8:00 a.m. to 4:30 p.m., but is now working 6:30 a.m. to 2:30 p.m., Monday — Friday. Mother lived in Newark, New Jersey when she had the children and for a period of time thereafter. Mother and the children lived with father at his home in Pennsylvania starting in 2011. When she lived in Pennsylvania, she held a similar job and worked 7:00 a.m.; to 3:00 p.m. Mother moved back to Newark, New Jersey in 2012 after her relationship with father ended. Mother and father were never married. Mother has a son, Jose, age 12. Mother's parents also live in Newark, New Jersey.

Father purchased his home in Pennsylvania in 2003. He lived on and off with mother in New Jersey after the birth of the children. Father, mother and the children, including Jose, started living full time in father's house in East Stroudsburg in July of 2011. Mother and Jose moved out in the fall of 2012, and John III and Juliana remained with father.

The parties have had a custody order since November 2, 2012. The parties seek a final custody determination and each seeks to be the primary custodian. Father also filed a petition for contempt, alleging mother took their daughter, Juliana, when it was not her time for custody. The incident occurred when father was outside of his car, securing a driveway gate at one of his rental properties. Mother parked nearby, and came up to father's car and removed Juliana from the back seat, despite father's protests. Mother then kept Juliana for a while, eventually returning her to father.

This court must consider the following factors in determining custody:

"(a) Factors — In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with

one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor."

23 Pa. C.S.A. §5328 (a).

We believe father is more likely to encourage and permit frequent and continuing contact between the children and mother, than mother is with father. We note that father has abided by the custody order to date. Father was convincing in his testimony that he wants mother to be an active parent to the children. On the other hand, mother has not abided by the custody order. Father was credible in his testimony that mother has picked up the oldest child from school when it was not her period of custody. Mother also took Juliana from father in the incident giving rise to the contempt petition. We find mother's prior actions in this regard significant indicators that she will be less likely than father to encourage and permit frequent and continuing contacts with the children.

The present and past abuse is a non-factor in these proceedings. Mother alleges father was physically and verbally abusive toward her and her son Jose, causing her to leave the East Stroudsburg residence in 2012. However, the two instances of physical abuse against mother that she said occurred were in November and December 2011.

This was nearly a year before she left the residence. Father also stated the one incident, in which mother cut her hand, fall of 2012, mother has done the same when the children are in her care. We find father is more available as a parent to the children due to mother's work schedule and the fact father is retired and has rental investments that allow him more flexible time. Father is able to be there at all times for the children without the need for child care. As such, this factor currently favors father.

There is some need for stability and continuity in the children's education, family life and community life. John III is going into the first grade. He attended East Stroudsburg School District last year. He would benefit from remaining in the same school district that knows him and his educational needs, and vice versa. John and Juliana have resided in the home in East Stroudsburg for two (2) years. They are both still very young, and it is important that there be minimal disruptions to a routine. Father is also home more often to provide care without having to change the children's routine.

The residence in East Stroudsburg, Pennsylvania would also be a more stable community for the children to reside. Father's house is on two (2) acres with open areas to play. The neighborhood is quiet and the elementary school is very close to father's house. Mother's residence is in Newark, New Jersey. While her home is appropriate, and mother's parents live close, the residence does not have an adequate outside play area. There are also more concerns of crime in Newark, as evidenced by the mugging of mother in front of the children. Father's home in East Stroudsburg would provide more stability and continuity for the children from a safety and security stand point.

Mother has more extended family close to her. Mother's parents live near mother and would assist in child care. Mother's son Jose also lives with her. Mother's sister and three was caused by mother trying to grab a saw father was using to cut brush, when she became angry with father. We do not find mother's testimony credible in light of the circumstances. We also do not find the testimony convincing that father physically abused Jose.

Although no specific example of verbal abuse was cited by mother against her or Jose, there was testimony father has been threatening and demeaning. Father said he was not verbally abusive toward Jose, but asked him to do chores around the house that Jose did not want to do. We also note that father's adult daughter reported he is a good father to the minor children and she did not report father ever being abusive to tham or to her. We find father has not committed past or present abuse as alleged under the circumstances presented in court.

Father has concerns that mother drinks to excess and previously caused a kitchen fire. He also testified to an incident where mother was mugged in front of John III and Juliana in Newark, New Jersey. Father believes mother cannot provide adequate physical safeguards and supervision of the children. Based upon the evidence, we do not attribute either incident to be a danger to the children based upon mother's care. These incidents do not reflect an inability of mother to properly safeguard or supervise the children. We do believe mother's work schedule will require others to supervise the children when she has custody. Father himself, due to his availability, is less likely to need others to provide care and supervision. However, we do not find either parent is less likely than

the other to provide adequate supervision.

The parties have been sharing parental duties throughout the lives of the children. mother and father both performed parental duties, including cooking, caring for the children, and raising the children when they lived together in New Jersey and in Pennsylvania. Although father has performed parental duties caring for the children more often than mother since the children live fifteen (15) minutes from her. Mother has five (5) sisters and one (1) brother, three of whom live in the Newark, New Jersey area. Father does not have extended family in Pennsylvania. Father's adult daughter lives in Mount Olive, New Jersey, approximately 30 miles from father's residence. This factor slightly favors mother.

The children maintain a relationship with their half-brother Jose, and their half-sister Shakirra. The testimony of father and Shakirra is that she spends time with the children. At 37 years old, Shakirra considers herself more like an aunt to the children. Jose, age 12, gets along well with the children. The children also appear to be bonded with him. Father has concerns with Jose's use of profanity, and playing video games that depict guns and violence. Father is also concerned with evidence of Jose's Facebook page that was introduced. We find any negative influence of Jose on the children to be minimal at this time. However, mother should be aware of Jose's use of Facebook and the persona that he portrays on it and any other social media. We can understand father's concerns if such behavior goes unchecked and leads to more, and eventually teaches John III and Juliana similar behavior.

The children are too young and lack the necessary

maturity and judgment to state a preference to be considered by this court. Therefore, this will be a non-factor. We do note that both children appeared to the court to be well behaved, well-adjusted, happy and bright children who love being with both parents.

We do not find any examples of either parent attempting to turn the children against or alienate them from the other parent. While both parents have plenty to say about the other, we find that neither has taken steps to turn the children against the other parent.

We find both parties will equally maintain a loving, stable, consistent and nurturing relationship with the children adequate for their emotional needs. Both parents are close to the children and bonded. Both parents are providing a loving and stable environment. Mother made a claim that Juliana, age 3, had soiled herself the week prior to the June 26, 2013 hearing in this matter and on one occasion prior to that. However, we find no credible connection to those two incidents, and father's ability to provide a nurturing, stable and consistent relationship with the children. There was no other testimony in this regard, and the incidents could have occurred for any multiple number of reasons. Therefore, we find both parents, based upon their testimony, will provide the necessary relationship with the children and this factor favors neither party over the other.

We believe father will be more likely to attend to the daily physical, emotional, developmental, educational and special needs of the children. This is due primarily because father is retired and available at all times for the children. Father has more time to get the children to and

from school, cook their meals, play with them on a daily basis, and work with them on homework. Father sees to his rental investments around the schedules of his children. This is not to say mother does not or cannot do these things when she is home from work. We believe mother to be a good parent and a hard worker and that she does all of the things father does for the children when she is home from work. However, father is available to attend to the needs of the children all day, every day. We find testimony of father that he provides for the daily care of the children to be credible. We find the examples cited in mother's side of the case of father's lack of providing this care were not credible. Therefore, this factor favors father.

The parties' residences are about one (1) hour from each other. This can allow for frequent and continuing contact of the parents with the children, but makes a shared custody schedule during the week impossible due to the distance, need for schooling, and mother's work schedule during the day. The proximity of the residences will require one parent being the primary custodian during the week and the children's breaks from school, and the other parent receiving frequent time periods to spend with the children. This will be taken into an account in the custody order

Both parties are able to care for the children, or provide appropriate child-care. Although mother works during the week, she is able to provide child care through the assistance of her parents and other family members. Since father is retired, he is home at all times for the children. He works around the children's schedules when he manages his rental properties. Father's schedule is flexible for the children. As a stay-at-home parent, he is available and dependable to see to the children's needs. Although mother

can provide child-care when needed, father's availability as a parent to the children who are both relatively young, is important to the children. As such, this factor favors father.

There is a moderate amount of conflict between the parties and a likelihood they will not always be cooperative with each other. Father alleges mother has taken John from school during his period of custody. Father testified mother has done this 8 or 9 different times. This court witnessed on video mother taking Juliana from father's car during father's period of custody.[1] We find father's testimony in this regard to be convincing.

Mother counters that father has left Juliana alone in the car on at least two (2) occasions when he went inside one of his rental properties. She alleges that on the date she removed Juliana from the car while father was standing there, it was because she had not seen Juliana on her birthday two (2) days earlier. Mother stated she drives by father's rental property everyday for work and that she stopped when she saw father's car to say hello to Juliana. Mother claims she asked to take Juliana for a few hours since she missed her birthday.

Mother's testimony was not convincing to this court. The video did not depict mother simply saying "hello" or trying to have a calm conversation with father about spending a few hours with Juliana. It was a chaotic scene, that did not appear to be appropriate behavior in front of the child. Furthermore, the incident was at 1:00 p.m.,

---

1. Father was parked in front of one of his rental properties and was closing and locking the driveway gate. Father had a surveillance camera at the property and it recorded part of the incident. This is the incident giving rise to father's contempt petition.

shortly before father would need to leave for Pennsylvania to pick up John from school. The timing of the incident does not fit with mother's work schedule and she made no mention of leaving work early that day. This incident, and the others described by father, shows a likelihood of continued conflict between the parties. We also note mother did not appear to understand, or try to understand, the current custody order regarding the periods of custody she can elect during the children's summer. These issues will create problems between the parties if not stopped.

We also find the general demeanor of the parties in court, mother's lack of respect for a custody court order, and father's description in court of his current feelings and view of mother to be problematic. It shows the parties may not put aside their differences, in an attempt to cooperate for the best interests of their children. We find mother's prior behavior most troubling at this time since it interferes with father's custody time and creates more tension between the parties. It also violates an existing court order. That is not to say father is without his faults in this situation. Father's demeanor in court, and his derogatory comments about mother's concern for money and how she chooses to dress is going to continue to hurt the communication between the parties; and ultimately, co-parenting their children. Father's attempts to describe what he thinks is proper and respectful behavior, was stated in a disrespectful manner. Father may expect the mother of his children to act and dress a certain way for their benefit, but father fails to realize that his choice of behavior and words toward mother is not going to benefit the children. The manner in which both parties act, both privately and publicly, will eventually be realized by the

children and potentially learned by them as the way to act and view and treat others. Regardless of personal feelings, father should reconsider his actions. The children should not learn to be disrespectful.

There was some testimony from father that he has concerns for mother's drinking alcohol. There were no other allegations of drug or alcohol abuse by the parties. Father cited a few concerns, none of which can be confirmed. He believes mother has a drinking problem and is careless when she drinks. We do not view this as a factor currently effecting custody of the children, but we will order mother to submit to an initial drug & alcohol evaluation to address father's concerns as a condition of this custody order. Any further concerns thereafter can be addressed in a petition for change in custody if necessary.

There were no allegations of a mental or physical condition of a party or member of the parties' households that effects custody. Father is retired in part due to a heart condition; however, there was no testimony from either party that this is a serious condition or one that effects periods of custody with the children. This factor is not relevant to these proceedings.

Further considerations have been given to other relevant factors. We find that father's home in East Stroudsburg, Pennsylvania is a safer environment for the children to reside than in Newark, New Jersey. Mother's home is appropriate. However, it is in an apartment complex without a large open area for the children to play. Newark is more congested with busy traffic. Newark also has more incidents of crime, and this family has already experienced a mugging in Newark. Mother even admitted

that she believed Pennsylvania was safer for the children after that incident, and one of the reasons she moved in with father in Pennsylvania with the children.

There was an incident reported by mother's son Jose that Juliana had a gun in her hand. Father admits owning guns, but they are locked away and inaccessible to the children. Father denies Juliana ever had a gun in her hand. We find father credible in this regard. He presents as someone who would be careful not to expose his children to guns without supervision, nor would he leave them accessible to children. Therefore, this is not a concern at this time.

At the hearing, a document (defendant's exhibit 1) was presented and testimony given regarding expectations of father if the parties reconciled. We note this was an attempt at reconciliation and nothing therein can be construed as harmful to the children's best interests. Therefore, we place no weight on this testimony.

Mother also introduced a typed letter into evidence as defendant's exhibit 2. It was drafted and signed by father. It dates from October 5, 2007. It purports to give up all legal rights of custody of John to mother. Father stated this was written as a joke and out of anger because mother had told him John was not his son. This letter also pre-dated the parties living together in Pennsylvania and is not relevant to these proceedings.

Mother also introduced documents from John's school as defendant's exhibit 6. One document indicated John made a threat on the bus on March 5, 2013, for which he lost one day of recess as punishment. The other incident acknowledged no one was at the bus stop on March 4,

2013, to pick up John, and that on March 1, 2013, father followed the bus to an alternate stop because he was not at John's regular bus stop on time. Mother also asserts father did not disclose this information to her. We note mother's exhibit contained a cover letter dated March 6, 2013 addressed to her at her Newark, New Jersey address. We also note mother shares legal custody and notice of that order was sent to John's school. Therefore, mother is being mailed notices, such as defendant's exhibit 6.

Father asserts John learned the language he used on the bus from Jose, or from playing video games with Jose. That may be the case; however, it is unknown. While the language is a concern, we do not believe it is a result of living with father, or something that will be overlooked by father to address with John.

Father explained he was late to the bus stop due to mother coming to see him and Juliana while he was at his rental property in Newark, preventing him from returning promptly to pick up John. Regardless of the actual reason, we do not find these two isolated incidents are currently factors in this custody matter. Father has had warning from the school, and should now realize he must allow more time to arrive at his son's bus stop or school to pick up John. Continued behavior in this manner, regardless of the reasons, can be grounds for the parties to petition for modification of the custody order. Likewise, mother should be respectful of father's need to return to Pennsylvania to pick up John from school if she is indeed seeing father and Juliana while they are in New Jersey.

Based upon a review of all of these factors, and the testimony in this case, we find father should have physical

custody of the minor children subject to periods of partial physical custody with mother. We adopt the attached order as the new custody order in this matter.

Father's petition for contempt will be dismissed as part of the new custody order. As discussed herein, the incident giving rise to the contempt petition was given consideration in this custody determination. No further action needs to be taken. However, mother should realize her actions to disregard the custody order, if continued, may give rise to a finding of contempt. This court will not tolerate any further disregard of our order.

We also expect the parties to try and work out custody issues as they arise, including trying to accommodate each other for additional time and schedule changes when possible. The parties were able to make accommodations for a summer vacation schedule in court on August 1, 2013, and the court hopes this communication can continue.

## ORDER

And now, this 14th day of August, 2013, following a full custody trial before the court wherein John Goode Jr. was present represented by Alexander J. Karam, Jr., Esquire and Juana Orozco was present represented by Nicholas Sabatine, III, Esquire, it is the order of this court, with respect to the parties' minor children, John III born November 2, 2006 and Juliana, born February 12, 2010:

## 1. SHARED LEGAL CUSTODY

Mother and father shall share legal custody of their children. For purposes of this order "shared legal custody" shall mean:

(a) All decisions affecting the children's growth and development, including but not limited to education, choice of school, medical and dental treatment, religious training, athletic pursuits and extracurricular activities shall be considered major decisions, and shall be made by the parties jointly after discussion and consultation with each other with a view toward obtaining and following a harmonious policy in the children's best interest;

(b) Each party agrees to keep the other informed of the progress of the children's education and social adjustment. Each party agrees not to impair the parties right to shared legal or physical custody of the children. Each party agrees to give support to the other in the role as parent and take into account the consensus of the other for the physical and emotional well-being of the children with the recognition that their life styles may be different;

(c) While in the presence of the children, neither party shall make or permit any other person to make any remarks or do anything which would in any way be construed as derogatory or uncomplimentary to the other parent. It shall be the express duty of each parent to uphold the other parent as one whom the children should love and respect;

(d) It shall be the obligation of each parent to make the children available to the other in accordance with the following schedule and to encourage him to participate in the plan hereby set forth;

(e) Each parent shall have the duty to notify the other of any event or activity that could reasonably be expected to be of a significant concern to the other parent or to the children;

(f) The parents shall communicate with one another concerning any parenting issues requiring consultation and agreement regarding a proposed modification of the custody schedule which may, from time to time, become necessary, and shall specifically not use the children as a messenger at any time. Neither party shall discuss with the children any proposed changes to this schedule or any other issue requiring consultation and agreement prior to discussing the matter and agreement with the other parent;

(g) With regard to any emergency decisions which must be made, the parent with whom the children are physically residing at the time shall be permitted to make a decision necessitated by the emergency without consulting the other parent in advance; however, that parent shall inform the other of the emergency and consult with him or her as soon as possible. Day to day decisions of a routine nature will be the responsibility of the parent having physical custody at that time;

(h) Mother and father agree to share complete and full information from any doctor, dentist, teacher or other authority, and each parent may have copies of any reports given to them as a parent. Each parent shall also request any authority to forward copies to both parents at their respective addresses. Such documents include, but are not limited to, medical reports, athletic and school reports, birth certificates, etc. Both parents may and are encouraged to attend conferences and activities with the children. Both parents shall be listed with any school or day care center as parents to be contacted in the event of an emergency and to be notified regarding school events. Mother and father agree to share copies of any school notices in a timely fashion;

(i) Both parents shall attempt to avoid scheduling any activities or appointments for the children which would require his/her attendance or participation during the time when he/she is scheduled to be in the physical custody of the other parent without the parent's prior approval; however, both parents agree to cooperate and be flexible in accommodating the children's scheduled activities.

## 2. SHARED PHYSICAL CUSTODY

Father shall have physical custody of the minor children, John III, age 6, and Juliana, age 3, under and subject to the partial physical custody rights of other, as follows:

(a) First, second and fourth weekends of every month beginning Friday at 6:00 p.m. and ending on Sunday at 6:00 p.m.;

(b) Following the second weekend of every month, mother shall have custody of the minor children on Thursday night of that immediate week (prior to the third weekend) from 5:00 p.m. until 7:30 p.m. This period of custody shall be exercised in Pennsylvania with mother driving to pick up and drop off the children at father's residence. If mother cannot exercise this period of physical custody in any given month, she shall give twenty-four (24) hours advance notice. If mother is going to be late in picking up the children, she shall call father immediately to let him know, in which case the visit shall still occur.

(c) Any other days and times upon which the parties shall mutually agree.

## 3. HOLIDAYS

The following holiday schedule supersedes all other

partial and vacation custody schedules established in this recommendation:

The parties shall alternate the major holidays as they may agree. If unable to agree, the alternating holiday schedule shall include the holidays of New Year's Day, Presidents Day, Easter, Memorial Day, Fourth of July, Labor Day, and Thanksgiving. Mother shall have partial custody on Mother's Day and father shall have partial custody on Father's Day. Those periods of partial custody for which no times for exchange were heretofore scheduled shall begin at 9:00 a.m. and end at 8:00 p.m. These periods of holiday custody shall begin with father on Easter Day, 2013.

The parties shall alternate Christmas. Father shall have physical custody of the children from Noon on Christmas Eve continuing until Noon on Christmas Day. Mother shall have physical custody of the children from Noon on Christmas Day until Noon on December 26th. The above period shall alternate each and every year.

In the event that a holiday to which mother is entitled shall fall within a day prior or subsequent to weekend period of partial custody to which mother would also be entitled, that period of weekend partial custody shall be extended to include mother's period of holiday partial custody.

The parties shall share custody of the children on the children's birthdays. If the parties cannot agree to a schedule, or the child's birthday occurs on a school day, at a minimum, the party having custody pursuant to this order, shall transport the minor child to the other parent for a two (2) hour visit with the child.

## 4. SUMMER VACATIONS

With respect to summer vacations, mother and father shall each be entitled to three (3) weeks of uninterrupted partial physical custody with the minor children, provided they give the other parent thirty (30) days prior notice of their intention to exercise that right, which periods may be taken in no more than one week segments beginning Sunday at noon and ending Sunday at noon. Each parent shall provide to the other parent the telephone number and address where they will be exercising their period of vacation custody.

## 5. TRANSPORTATION

The parents shall share transportation equally as they can agree. If they are unable to agree, in order to facilitate the exchange of partial custody, it shall be the responsibility of the party who will be obtaining partial custody, or a designee, to pick up the children at the residence of the other party. Appropriate passenger restraint devices shall be utilized by the children while being transported.

## 6. TELEPHONE ACCESS

Each parent shall allow the other parent to have private, liberal and reasonable telephone access with the minor children during that parent's period of partial custody. This shall include the children initiating such contact. The parties hereby agree that they will provide one cell phone for the children in order that each party may exercise her or his right to telephone access with the children. The costs for the cell phone shall be divided equally between the parties. Reasonable telephone access shall be construed to be during the children's normal waking

hours, emergencies excepted. If the calling parent leaves a message at the residence of the custodial parent, custodial parent shall require the children to return the telephone call to the non-custodial parent.

## 7. SPECIAL PROVISIONS

(a) Mother *shall not* remove the children from the United States of America at any time whatsoever without the written consent of father.

(b) Each party shall retain one passport for each of the children in his or her possession, in order that they may mutually agree to the places where the children may visit utilizing their passports. In addition, each parent shall secure notarized written permission from the other parent when traveling abroad with the children.

(c) Mother shall have a Drug & Alcohol evaluation with Catholic Social Services within 60 days and complete any recommended treatment. Mother shall sign releases for information to be given to her attorney, attorney for plaintiff and the court.

## 8. NOTICE: CHANGE OF RESIDENCE OR RELOCATION

Before a party may relocate the children *or* change the residence of the children in a manner which significantly impairs the ability of other individuals with custody rights to the children to exercise those rights, the party must comply with the requirements and obligations of Pennsylvania's Custody Law set forth in 23 Pa. C.S.A. 5337.